## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ABRAHAM ATACHBARIAN ROTH IRA, On Behalf of Itself and All Others Similarly Situated, | ) ) ) ) |  |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) ) |  |
| SYNUTRA INTERNATIONAL, INC., LIANG ZHANG, YALIN WU, LEI LIN, JINRONG CHEN, DONGHAO YANG, DAVID HUI LI, and BEAMS POWER MERGER SUB LIMITED, | ) ) ) ) ) ) ) |  |
| Defendants. | ) ) ) |  |

## CLASS ACTION COMPLAINT

Plaintiff, Abraham Atachbarian ("Atachbarian") on behalf of the Abraham Atachbarian Roth IRA ("Plaintiff"), by and through its undersigned counsel, for its class action complaint ("Complaint") against Defendants (defined below), alleges upon personal knowledge with respect to it, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a class action brought by Plaintiff on behalf of the minority public stockholders of Synutra International, Inc. ("Synutra" or the "Company") against Liang Zhang ("Zhang"), the chairman of the Board of Synutra, and a controlling stockholder, as well as the Board of Synutra, and Beams Power Merger Sub Limited ("Merger Sub"), to enjoin the going private transaction announced on or about November 17, 2016 (the "Transaction").

2.    On November 17, 2016, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with Beams Power Investment Limited ("Beams"), a Virgin Island entity whose sole stockholder and director is Xuiquing Meng ("Meng"), Zheng's wife and the Merger Sub, pursuant to which the Company will be taken private and the Company's minority stockholder will be squeezed out at $6.05 per share by Zhang, Meng, Beams and the Merger Sub (the "Buyer Group").  Zhang currently controls over 63% of the Company's shares through Beams, making this going private transaction and self interested.

3.    The Buyer Group now seeks to solicit minority stockholder approval of the Transaction by way of a materially false and misleading Preliminary Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "Preliminary Proxy") filed with the United States Securities Exchange Commission ("SEC") on December 9, 2016.

4.    Plaintiff files this action ("Action") to enjoin the Transaction unless and until Defendants circulate an accurate proxy with full disclosure.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action pursuant to Section 14(a) of the Exchange Act [15 U.S.C. Section 78j(n)], or federal question jurisdiction.  The Court also has supplemental jurisdiction over any state law claims.

6.     Venue is properly laid in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. Section 1391(b) and (c).  The acts and conduct complaint of herein occurred in substantial part in this District.

7.     Moreover, the Company is incorporated in this District, and defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

8.      In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

## PARTIES

9.      Plaintiff at all times relevant hereto has been a Synutra stockholder.

10.     Defendant Synutra International, Inc., is a leading infant formula company in China that engages in the production, distribution and sale of dairy based nutritional products under the Shengyan or Synutra line of brands.  The Company, which is a Delaware holding company that conducts its business through its operating subsidiaries in China, has executive offices in Beijing and a headquarters located at 2275 Research Boulevard, Suite 500, Rockville, Maryland 20850.  It is incorporated in Delaware and trades on the NASDAQ Global Exchange under the ticker symbol "SYUT".

11.     Defendant Liang Zhang is the Company's founder, the chairman of the Company's Board and its chief executive.  The proxy dated January 2016 indicates that Zhang beneficially controls and owns 36,000,000 shares of the Company's outstanding shares, or 63.33% of the Company through Beams.

12.     He holds his shares through Beams, an investment holding company formed for that purpose.  Meng is Beams' sole stockholder and has been a director of Beams since 2005. Beams is the Company's largest stockholder and its controlling stockholder.   Zhang has dispositive and voting power over its investments.

13.     Defendant Donghao Yang ("Yang") was the Company's chief financial officer from May 2010 to August 2011, and is a director.

14.     Defendant David Hui Li ("Li") has been a director of the Company since

February 8, 2010.

15.     Defendant Jinrong Chen ("Chen") has been a director of the Company since June 27, 2006.

16.     Defendant Lei Lin ("Lin") has been a director of the Company since October 1, 2007.

17.     Defendant Yalin Wu ("Wu") has been a director of the Company since early 2016.

18.     The Defendants identified in paragraphs 11 through 17 above are collectively referred to herein as the "Individual Defendants."

19.     Defendant Beams Power Merger Sub Limited is a Delaware corporation and a wholly-owned subsidiary of Beams through which the Transaction is to occur.

20.     The Merger Sub is being sued so that complete relief may be granted.

<u>CLASS ACTION ALLEGATIONS</u>

21.     Plaintiff brings this action as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of himself and the other public stockholders of Synutra  (the "Class"), who are or will be damaged by a vote approving the Transaction pursuant to the materially false and misleading  Preliminary Proxy.  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22.     This action is properly maintainable as a class action as the damage to be suffered here is by Class members and stockholders of the Company, and not directly by the Company itself.

23.     The Class is so numerous that joinder of all members is impracticable.  As of January, 2016, there were approximately 56,836,797 shares of Synutra common stock

outstanding, held by registered stockholders, and by brokerage houses and institutional holders throughout the country.

24.     Questions of law and fact are common to the Class, including, among others: (i) whether the Preliminary Proxy is materially false and misleading; and (ii) whether Defendants will irreparably harm Plaintiff and the other members of the Class if Defendants' conduct complained of herein continues and is not enjoined

25.     Plaintiff is committed to prosecuting this Action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.   Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

26.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

27.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

***Synutra is Part of a Wave of Going Private Transactions***

28.     The Transaction is part of a wave of management buy outs by Chinese companies and entrepreneurs of their minority U.S. stockholders at unfair prices and inadequate premiums.

29.     In this instance, by way of the Transaction, the minority stockholders of Synutra, a company whose operations are located in China, but which has traded on the NASDAQ Global Exchange since 2008, are being squeezed out by the Company's controlling stockholder and beneficial holder of over 63% of the Company's outstanding shares, Zhang, through an entity owned by his wife, Meng, at a price which even the purported independent investment advisor, Houlihan Lokey Capital, Inc.'s ("Houlihan Lokey") own discounted cash flow analysis indicates is low.

30.     China's dairy industry is rapidly increasing with, among other things, the adoption of the two children per family policy, and the recognition in China of the health benefits of milk consumption.

31.     Synutra is a company engaged in the production, distribution and sale of dairy based nutritional products, with a focus on selling powdered formula for infants and adults.  It sells its products through an extensive nationwide sales and distribution network covering all the provinces and provincial level municipalities in mainland China, consisting of over 850 independent distributors and 290 independent sub-distributors who sell its products in approximately 24,000 retail outlets.

32.     In early 2016, the fortunes of the Company were potentially on the rise.  At the same time, a $55 million debt facility owed by Beams, the entity through which Zhang holds his shares of the Company, was soon to become due, necessitating a refinancing.

33.     On January 14, 2016, the Buyer Group made its first offer to purchase the remainder of the shares that they did not own for $5.91 per share, although the Company had been trading at over $7.00 per share as recently as the first quarter of 2015.

34.     Although Davis Polk & Wardwell LLP ("Davis Polk") was the Company's

counsel, the Buyer Group determined to retain Davis Polk for itself, causing the Company to retain new counsel.

35.     A special committee ("Special Committee") of the Board, consisting of Wu, Chen and Lin was created, which then retained counsel and Houlihan Lokey.

***The Transaction Enables Zhang and Meng to Refinance a $55 Million Debt Facility***

36.     Within weeks of its formation, the Buyer Group informed the Special Committee that it had to refinance a $55 million debt facility with Nomura Singapore Limited (the "Nomura Facility"), which was coming due and which was secured by Beam's holdings in the Company. Beam's default on the Nomura Facility would have had severe negative consequences for the Company.

37.     The Buyer Group indicated that it was seeking to refinance that debt through the sale of a note, pledged by Beam's shares of the Company, with Forebright Capital ("Forebright").  The refinancing was to consist of the Buyer Group's sale of a three year convertible exchangeable note convertible into preferred shares of the Company (giving Forebright 20% of the Company) for $60 million, enabling the Buyer Group to pay off the Nomura Facility, but potentially giving Forebright a significant portion of the Company's outstanding shares.

38.     Under the terms of the refinancing or the FNOB Note, the possibility that Forebright would become a substantial stockholder was eliminated as if the Company went private, Forebright would only have the right to convert the Note to shares of Beams, with Zhang and Meng guaranteeing Beams' obligations under the Note.  If the Company failed to go private and was still listed on NASDAQ Global Exchange at the time that the Note matured, Forebright would have the right to exchange the Note for certain shares of the Company held by Beams.

7

The Special Committee thus had an incentive to push through a going private transaction, in order to avoid Forebright becoming a 20% holder of the Company's shares, and thus a substantial stockholder with concomitant power.

39.     Moreover, under the FNOB Note, Zhang and Meng were guarantors of the 10% interest due and owing on the Note unless the Company became private by way of a going private transaction, giving them even further incentive to push for a going private transaction.

40.     After some negotiation and consideration, the Special Committee approved the refinancing, giving the Buyer Group further incentive to complete a going private transaction and the Special Committee, the incentive to approve it so as to avoid a conversion by Forebright of the Note and its obtaining of a significant percentage of the Company's shares.

***The Special Committee Conducts a Sham Market Check***

41.     In about June 2016, in order to clear the way for the Transaction, the Special Committee with the input of Houlihan Lokey and its counsel, determined to conduct a market check despite the fact that a market check could not be successful as the Buyer Group was unwilling to sell its shares, even at price higher than the $5.91 it was then offering (indicating that it believed the potential price of the Company to be far greater than its offer.)

42.     Rather than negotiate with the Buyer Group, or reject the offer as inadequate, the Special Committee had Houlihan Lokey contact 25 potential bidders, none of whom considered a potential transaction given the Buyer Groups controlling position and the fact that it was unwilling to sell its shares, among other reasons.

43.     At the same time, in anticipation of approval of the Transaction, the Buyer Group secured potential debt financing for the Transaction from Shanghai Pudong Development Bank Co., Ltd.

*Houlihan Lokey Gets a Slight Increase of the Price*

44.     By September 2016 (and with the Chinese milk industry having been rocked by a scandal concerning the sale of fake powdered milk on the internet), the Special Committee concluded that the offering price was within the preliminary implied equity value range, but directed Houlihan Lokey to meet with Zhang to determine whether he would raise his price.

45.     Zhang indicted that the Buyer Group would raise its offer to $6.05 but that this offer was a "best and final" offer.

*The Special Committee Accepts the Offer Rationalizing that Stockholders Could Vote Against It*

46.     Although it had not considered certain alternatives to the Transaction, including remaining as a standalone Company, nor did it have Houlihan Lokey perform any analysis of alternatives, and had conducted a relatively worthless market check given the Zhang and Beams position respecting the sale of their shares, and with no leverage, the Special Committee capitulated that the $6.05 price per share was within the range of implied value derived by Houlihan Lokey, reasoning that the minority stockholders would have the opportunity to vote for or against the Transaction (and thus decide for themselves whether to accept it, presumably on full and fair information).   Moreover, at the time, as the Special Committee was aware, the Company's newly built factory in France was not yet operating.

47.     Effectively having thrown the decision back to the minority stockholders, the Special Committee determined to recommend the offer.

48.     Specifically, the Special Committee rationalized its decision by reasoning that its time was better spent on the terms of the Merger Agreement than obtaining a new best and final offer, since stockholders would be able to vote upon whether to accept the Transaction.

***The Merger Agreement is Entered Into***

49.     The parties then negotiated the terms of the Merger Agreement. Although Zhang and Meng agreed only to provide a limited guarantee of Beams obligations under the Merger Agreement, the Special Committee, based upon Houlihan Lokey's opinion, among other things, recommended that the Board approve the Merger Agreement and the Transaction.

50.     On November 17, 2016, the Company announced that it had entered into the Merger Agreement.

51.     Thereafter, Houlian Lokey conducted a post market check.  However, as the Buyer Group was unwilling to sell its shares, the market check was unsuccessful.

52.     The Special Committee's unenthusiastic recommendation of the Transaction, and its rationalization that the stockholders could make a decision by voting against the Transaction, has put the onus on the stockholders.

***The Preliminary Proxy is Materially False and Misleading***

53.     The Preliminary Proxy, particularly its description of the Houlihan Lokey fairness opinion and underlying analysis is materially misleading and omits material information such that stockholders are unable to cast a fully informed vote respecting the Transaction.

***The Preliminary Proxy Fails to Disclose Certain Essential Projections***

54.     The Preliminary Proxy contains three sets of projections, called the May Projections, the August Projections and the Company's Projections, each purportedly reflecting projections for the Company given the information available at three different time periods in 2016.

55.     These projections are incomplete and misleading, however, as they fail to disclose the Company's net income, its operating income, the unlevered free cash flow, the earnings per

share, and the free cash flow per share—all of which are critical if a stockholder is to understand the amount of consideration which it is being asked to forego for the buyout consideration being offered.

56.     Moreover, Houlihan Lokey specifically relied upon the Company's projected unlevered, after-tax free cash flow in its discounted cash flow analysis, discussed below. Although the Company does disclose EBIT, it does not disclose the free cash flow on a per share basis which is essential to enable stockholders to understand what they are foregoing in the Transaction.

57.     The projections, and Houlihan Lokey's analyses further make reference to both the Company's EBITDA and its adjusted EBITDA but fails to disclose the adjustments made to the Company's EBITDA to derive the adjusted EBITDA.  Moreover, the Preliminary Proxy does not contain the projections for the adjusted EBITDA.

***The Houlihan Lokey Analysis***

58.     The Preliminary Proxy discloses three analyses performed by Houlihan Lokey in support of its fairness opinion:  (1) A Selected Companies Analysis; (2) A Selected Transaction Analysis; and (3) A Discounted Cash Flow Analysis.

59.     Both the Selected Companies and the Selected Transaction analyses are based upon Houlihan Lokey's calculation of market multiples, including high, low, mean and median multiples which it then applied to the Company and to the terms of the Transaction to determine a range of reasonableness and the implied enterprise value of the Company, among other things.

***Selected Companies Analysis is Misleading***

60.     The Selected Companies Analysis is particularly misleading.  That multiples analysis is based upon Houlihan Lokey's selection of 13 companies and a determination of their

enterprise values as a multiple of both their EBITDA and adjusted EBITDA for the latest twelve months, the next fiscal year, and the following fiscal year.

61.     Significantly, six of the twelve companies from which Houlihan Lokey derives multiples are Chinese companies that trade on the highly controlled and undeveloped stock market in China, including the Hong Kong, Shanghai, and Shenzen exchanges.   Given that at least Shanghai and Shenzen are controlled exchanges, in which the Chinese government buys and sells shares in order to control and effectively set prices, they cannot be compared and thus are not peers of the Company, which, although based in China, trades on the efficient NASDAQ exchange.

62.     Moreover, Houlihan Lokey then cherry picked six additional companies from various other exchanges, including the Kuala Lumpur, the Tokyo, the Korean, the Swiss and the New Zealand exchanges in order to derive multiples, rather than using truly comparable companies that are traded on U.S. exchanges.  Given that the Company trades in the U.S., it is more than questionable as to whether the multiples based upon these companies which trade on non-U.S. exchanges, particularly on the inefficient and controlled Chinese exchange are comparable and can yield accurate multiples.

63.     At a minimum, the Preliminary Proxy is misleading in that it fails to disclose the actual multiples derived for each of these selected companies, such that stockholders would be able to determine which companies' multiples are outliers, not give them much deference.

64.     The discussion of the Selected Companies fails to make any reference to the fact that none of the selected companies trades on a U.S. exchange.

65.     Based upon the derived multiples, Houlihan Lokey then determines a high, low, mean and median multiples and applies them to the Company's EBITDA, and adjusted EBITDA

(which is not disclosed).

66.    In determining the range for the Company's implied share price, Houlihan choses a range of multiples that is almost uniformly below the mean and median range of multiples that it has derived from its selected companies analysis, without any explanation, but which leads to a lower implied price per share for the Company (thereby justifying the offering price).

67.    For instance, the mean and median multiple ranges for the enterprise value to adjusted EBITDA for the last twelve months for the selected companies, is 10.9x and 10.6x, respectively.

68.    Nonetheless, in determining a range to apply to the Company, Houlihan Lokey uses a range of 8.0x-10.0x, which is well below the mean and median range.  Similarly, with the analysis of the enterprise value to adjusted EBITDA for the next twelve months + 1, for the selected companies, Houlihan Lokey derives a mean and median multiple of 9.2x, and 8.8x, respectively but then applies a range completely below that mean and median of 5.5x to 7.5x, to the Company, once again without explanation, thereby justifying a significantly lower implied price per share for the Company.

***The Selected Transaction Analysis***

69.    The Selected Transaction Analysis is similarly misleading.

70.    Once again, the selected transactions are not comparable, as for the most part, they do not involve buy outs of companies traded on a U.S. exchange.   In fact, few if any of the transactions involve a going private transaction by a controlling stockholder, and none involve a going private transaction of a Chinese company that is traded on a U.S. exchange, in which the buyout consideration is being offered to U.S. stockholders.

71.    Given that, the Preliminary Proxy should, but does not, disclose the multiples

applicable to each of the selected transactions.

72.     Based upon these selected transactions, Houlihan Lokey derived a high, mean, median and low multiple of the "transaction value" (effectively defined as the implied enterprise value of the target company) to the target companies' EBITDA for the last twelve months, but then applied a range of multiples to the Company's last twelve months EBITDA and adjusted EBITDA that was below the mean and median multiples.

73.     For instance, Houlihan Lokey derived a mean and median multiple of 12.1x, and 10.5x, for the transaction value as a multiple of EBITDA for the selected transactions, but then applied a range of 8.5x to 10.5x to the Company's EBITDA and adjusted EBITDA to derive highly depressed implied per share values for the Company, thereby justifying the offering price.

***The Discounted Cash Flow Analysis***

74.     The Discounted Cash Flow analysis is based upon the Company's unlevered, after tax, free cash flow, which is not disclosed.  Although the analysis indicates that the unlevered cash flow is defined as EBIT, less tax expense of 25%, plus depreciation and amortization, less capital expenditures, less change in net working capital, that calculation or the free cash flow per share, is not disclosed to stockholders.

75.     Moreover, the analysis used by Houlihan Lokey to determine terminal values, or the extremely high discount range of 12.0% to 15.0%, is never disclosed.  In fact, there is no indication as to how Houlihan Lokey derived either the terminal value or the discount range.

76.     Perhaps most importantly, the range of values that Houlihan Lokey derived for the Company was US$3.81 to US$9.29, indicating that the offering price fell well below the high point of that range, and that there is significant room for a higher price.

## COUNT I

**(Against the Individual Defendants and Synutra for Violations of Section §14(a) of the 1934**

**Act and SEC Rule 14a-9 Promulgated Thereunder)**

77.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

78.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the 1934 Act, 15 U.S.C. §78n(a), provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

79.     The Individual Defendants named above prepared, reviewed and/or disseminated the false and misleading Preliminary Proxy, which misrepresents and/or omits material facts necessary to make the statements made, in light of the circumstances under which they were made not misleading, as detailed in paragraphs 53 through 76, above.  Synutra is liable as the issuer of these statements.

80.     The written communications made by the Individual Defendants described above constitute violations of Rule 14a-9 and §14(a) because such communications are materially false and/or misleading and were provided in at least a negligent manner.  Synutra is liable as the issuer of these statements.

81.     By reason of the misconduct detailed herein, the Individual Defendants and Synutra are liable pursuant to §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

82.     This misconduct will result in irreparable injury to Class members unless the vote

on the Proposed Transaction is enjoined, and/or the Proxy Statement/Prospectus is modified.

## COUNT II

### (Breach of Fiduciary Duty of Disclosure
### Against the Individual Defendants)

83.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

84.     The Individual Defendants have caused materially misleading and incomplete information to be disseminated to the Company's public stockholders.   The Individual Defendants have an obligation to be complete and accurate in their disclosures.

85.     The Preliminary Proxy fails to disclose material information, including financial information and information necessary to prevent the statements contained therein from being misleading.

86.     The misleading omissions and disclosures by the Individual Defendants concerning information and analyses presented to and considered by the Board and its advisors confirm the inadequacy of disclosures to the Company's stockholders.   Because of the Individual Defendants' failure to provide full and fair disclosure, Plaintiff and the Class will be deprived of their ability to make an informed decision with respect to the Proposed Transaction, and thus are damaged thereby.

87.     Plaintiff and the members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Transaction and any vote

on the Transaction;

      C.      In the event Defendants consummate the Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

      D.      Directing Defendants to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

      E.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

      F.      Granting such other and further relief as this Court may deem just and proper.

Dated:  December 22, 2016

**BIGGS & BATTAGLIA**

By:  */s/Robert D. Goldberg*

Robert D. Goldberg (ID#631)
921 N. Orange Street
Wilmington, DE 19801
(302) 655-9677

*Attorney for Plaintiff*

OF COUNSEL:
THEGRANTLAWFIRM, PLLC
Lynda J.  Grant, Esq.
521 Fifth Avenue, 17th Floor
New York, NY 10175
(212) 292-4441(*telephone*)
(212) 292-4442 (*facsimile*)
lgrant@grantfirm.com